# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**SAMUEL ZAINER,**

           **Plaintiff,**

v.                                                                  Case No. 11-C-1141

**MICHAEL J. ASTRUE,**
**Commissioner of the Social Security**
**Administration,**

           **Defendant.**

# DECISION AND ORDER

This matter filed by the Plaintiff, Samuel Zainer ("Zainer"), is before the Court, pursuant to 42 U.S.C. § 405(g), for judicial review of the final decision of the Commissioner of the Social Security Administration denying Zainer's application for Social Security Disability Insurance Benefits, Child's Insurance Benefits,[1] and Supplemental Security Income ("SSI") for lack of disability.

## Background

The Social Security Act authorizes disability benefits for those who are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be

---

[1] Under the Social Security Act, an applicant qualifies for child's insurance benefits if he meets the Act's definition of "child," is unmarried, is below specified age limits, namely, 18 or 19, or is under a disability which began prior to age 22, and was dependent on the insured wage earner at the time of the wage earner's death. Social Security Act, § 202(d)(1), 42 U.S.C.§ 402(d)(1). *See Astrue v. Capato ex rel. B.N.C*, __ U.S. __ , 132 S.Ct. 2021 (2012).

expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In order to be found disabled, a claimant must demonstrate that his physical and/or mental impairments prevent him from doing not only his previous work, but any other substantial gainful employment that exists in the national economy considering his age, education and work experience. 42 U.S.C. § 423(d)(2)(A). To determine whether a claimant is disabled, the Commissioner has established a five-step sequential analysis. *See* 20 C.F.R. § 404.1520.[2]

Zainer protectively filed applications for benefits on December 13, 2007, alleging an amended disability onset date of December 4, 2007. (Tr. 14, 162-65, 169-72.) After his application was denied initially and upon reconsideration, Zainer requested a hearing. Zainer, represented by counsel, appeared and testified at a July 9, 2010, hearing before Administrative Law Judge ("ALJ") Margaret J. O'Grady. (Tr. 37.) Zainer's mother, Margaret Zainer, attended the hearing and also testified. (*Id.*) At the ALJ's request, vocational expert, Stephen P. Davis ("Davis") also appeared by speaker phone and testified. (*Id.*)

By a Decision dated August 11, 2010, the ALJ denied Zainer's applications for benefits. (Tr. 14-21.) At step one, the ALJ found that Zainer had not engaged in substantial gainful activity since the December 4, 2007, amended alleged onset date. (Tr. 16.) At step two, the ALJ found that Zainer's "schizophrenia, major depressive disorder with psychosis; [and] anxiety disorder" were severe impairments. (*Id.*) At step three, the ALJ found that none of Zainer's impairments either alone or in combination met or equaled the criteria for a listed

---

[2]The Court's citations to the Social Security Act and regulations promulgated by the Social Security Administration are those applicable to disability insurance benefits. For SSI benefits, materially identical provisions appear in Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq*, and at 20 C.F.R. § 416.901 *et seq*.

impairment in Appendix 1, Subpart P of 20 C.F.R. § 404, specifically listings §§ 12.03, 12.04, or 12.06. (Tr. 17.) At step four, the ALJ found that Zainer had the residual functional capacity ("RFC") for work at all exertional levels but had non-exertional limitations requiring that such work be "unskilled work with only 1 or 2 steps; no public contact; [and] only occasional interaction with co-workers and supervisors." (Tr. 18.)

The ALJ noted that Zainer testified that he could not keep up with a regular work pace, and that he lost concentration and isolated himself from others. (Tr. 19.) The ALJ found that Zainer's "medically determinable mental impairments could reasonably be expected to cause the alleged symptoms; however, [Zainer's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (*Id.*) At step four, the ALJ found that Zainer had no past relevant work. (*Id.*) At step five, considering the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, as a framework for decision-making together with the testimony of the vocational expert, the ALJ found that Zainer could perform a significant number of jobs available in the national economy as a table worker and assembler. (Tr. 19-20.)

Zainer requested review of the ALJ's decision and filed a memorandum and evidence in support of the request. (Tr. 31, 282-83.) The Appeals Council granted the request for review. On July 14, 2011, the Appeals Council notified Zainer that it had granted his request for review and proposed to issue a decision that he was not entitled to benefits. (Tr. 77-81.)

3

On August 31, 2011, the Appeals Council incorporated the newly submitted evidence as part of the record, and issued a final unfavorable decision with new findings and incorporating, in part, the ALJ's decision. (Tr. 1-10, 77-81.) Thus, the decision of the Appeals Council is the Commissioner's final determination. 20 C.F.R. § 404.981.

The Appeals Council adopted and incorporated the ALJ's findings at steps one, two, and three of the sequential evaluation. (Tr. 5.) The Appeals Council further adopted the ALJ's RFC finding. (Tr. 6.) The Appeals Council then considered the Disability Summary Report dated June 19, 2008, and found that the ALJ's decision had not properly considered the report. (*Id*.) However, the Appeals Council found the report consistent with the ALJ's RFC determination. (*Id*.) The Appeals Council then adopted and incorporated the ALJ's findings regarding Zainer's credibility, the medical evidence, the lack of past relevant work, and the step five finding. (Tr. 6-7.) The Appeals Council found Zainer not disabled at step five due to the ability to perform a significant number of jobs. (Tr. 8.)

On appeal, Zainer raises two issues regarding the Commissioner's final decision. First, Zainer contends that the ALJ's credibility assessment is not supported by substantial evidence and does not comply with Social Security Ruling ("SSR") 96-7 in the assessment of his underlying medically determinable impairments. Second, Zainer maintains that the ALJ's RFC assessment is unsupported and omits critical limitations.

4

Case 2:11-cv-01141-RTR   Filed 01/23/13   Page 4 of 19   Document 21

## Credibility Assessment

The ALJ's credibility evaluation is extremely sparse. She stated that Zainer's statements about his impairments and limitations were "not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. 19.) Similar statements regarding credibility have been termed "meaningless boilerplate." *See Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012). The credibility assessment also violates the SSR 96–7p requirement that the ALJ specify which statements are credible and which are not, explaining why by reference to all of the pertinent factors set forth in the regulations. *See Spiva v. Astrue*, 628 F.3d 346, 348 (7th Cir. 2010). It also backwardly "implies that the ability to work is determined first and is then used to determine the claimant's credibility," *Bjornson*, 671 F.3d at 645, rather than evaluating credibility as an initial matter in order to come to a decision on the ultimate question of work capacity, *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 788 (7th Cir. 2003).

To this boilerplate, the ALJ added the observations that Zainer had been hospitalized before his alleged disability onset date, and that since then he had improved significantly. She found that Zainer's recent treatment records indicated that his mood is stable and his anxiety is reduced, citing exhibit 15 F (*See* Tr. 474-91.) (Tr. 19.) The ALJ also noted that Zainer had not been hospitalized since his onset date (*Id.*)

However, the ALJ's decision does not sufficiently articulate consideration of the relevant medical evidence which discloses that Zainer's condition is not so easily characterized.

5

"[T]o read the ALJ's boilerplate credibility assessment is enough to know that it is inadequate and not supported by substantial evidence." *Punzio v. Astrue*, 630 F.3d 704, 709 (7th Cir. 2011).

Prior to Zainer's amended alleged onset date he sought care, in March 2006 and March 2007, from psychologist Harvey Honig ("Honig"). In a July 2007 letter, Honig explained that in March 2007, Zainer "was dealing with many fantasies of attack and danger which definitely had a paranoid flavor" such that he was referred to a psychiatrist. Honig also requested that Zainer be evaluated for bipolar illness which was possibly part of his background. (Tr. 295.)

On June 23, 2007, Zainer sought emergency room treatment at St. Mary's Hospital in Madison, Wisconsin, reporting anxiety and auditory hallucinations. A psychiatric assessment was completed, (Tr. 426-31), and Zainer was referred to the Mental Health of Dane County ("MHDC") for evaluation of anxiety, auditory hallucinations, and possible early schizophrenia. (Tr. 427). Two days later, on June 25, 2007, Zainer was seen at MHDC, reporting disorganization and poor decision-making since February 2007. Zainer reported not being focused enough to complete a job application; driving to Northern Wisconsin to escape his problems; having interpersonal difficulties with his employer's son resulting in the loss of his job, then writing an "inappropriate" letter to the son; having a fixation that the son was going to hunt him down and harm him and his family; feeling judged and turned away from the church which led him to put his baptism candle on the church stoop to signal that the church was not

6

helping him; and other problems. (Tr. 305.) Zainer also dropped out of Madison Area Technical College in March 2007 due to an inability to complete tasks. (Tr. 307.) Zainer's thought process was noted to be tangential and hard to follow at times. Treatment was initiated and Celexa, Risperidone, and Cogentin were prescribed. (Tr. 307-08).

On July 18, and August 8, 2007, Brian Berendes, M.D. ("Berendes") saw Zainer for medication reviews. (Tr. 300.) On August 21, 2007, Zainer came to MHDC on an urgent basis due to increasing disorganization of thoughts and paranoid thoughts. (Tr. 298.) As a result, Berendes saw Zainer on August 22, 2007. (*Id*.) Zainer had a new job as a bagger at a store and was unable to focus on his job because "things come by him too quickly and he has an 'analytical nature.'" (*Id*.) Zainer stated that the bagging job was not a good fit for him. (Tr. Tr. 299.) Zainer was exhibiting more psychotic-type symptoms, for which medications were increased. (*Id*.) On September 5, 2007, Zainer met with Berendes for further psychiatric care and, despite medication increases, was still "quite anxious" with scattered thoughts, inability to focus, drowsiness due to medication, and psychomotor agitation. (Tr. 296-97.)

On September 14, 2007, Zainer was admitted for inpatient psychiatric treatment at Waukesha Memorial Hospital in Waukesha, Wisconsin, following a suicide attempt due to "a crisis of identity and functioning related to the onset of schizophrenia." (Tr. 311-14.) On September 15 and 16, 2007, during his inpatient treatment, Zainer underwent psychological testing with Russell Brethauer, Psy.D. ("Brethauer") to determine whether Zainer had a formal thought disorder. (Tr. 311-14). The Minnesota Multi-Phasic Personality Inventory ("MMPI")

7

and other tests were deemed to be "consistently and clearly" supportive of a schizophrenia diagnosis, with distortion of rational thinking due to confusion and delusional thinking, and probable psychotic process. (Tr. 313.)

Brethauer noted that Zainer's functioning was "characterized by pervasive bizarre feelings, influence[d] by external agents . . ." and it was "apparent that he engages in private autistic fantasy, and experiences significant difficulty in his thinking and communication. His social functioning is characterized by high anxiety when in contact with other people, which he seems to have compensated for by social withdrawal and aloofness." (*Id.*) Zainer was diagnosed with schizophrenia, paranoid type, with a current global assessment of functioning ("GAF") of 35 and a highest GAF in the prior year of 60.[3] (Tr. 314). Zainer was discharged into the partial hospitalization program on September 24, 2007. (Tr. 311-36, 396-97, 411-12, 415-20). From September 24, through October 19, 2007, Zainer was treated through the partial hospitalization program for mood lability, suicidality, delusional ideation, and thought blocking. (Tr. 391, 394).[4] Upon his release from the program, he was referred to county mental health services. (Tr. 391.)

---

[3]GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000). A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.* at 34. A GAF score of 31 to 40 reflects some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., avoids friends, neglects family, and is unable to work). *Id.*

[4]The ALJ's decision reports only two hospitalizations in 2007. While the record suggests that there may have been additional hospitalization, (*See* Tr. 344, 391.) the record does not establish that the ALJ's determination is not supported by substantial evidence.

On November 6, 2007, Zainer was hospitalized at Waukesha Memorial Hospital after a serious overdose of multiple medications. (Tr. 391, 398-99.) It was noted that Zainer had recently started a job as a parcel packer. (Tr. 401.) On November 9, 2007, Zainer was transferred to the Waukesha County Mental Health Center ("WCMHC") for continuing hospitalization. (Tr. 344, 399.) He was diagnosed with major depression with psychotic features, and schizophrenia by history. (Tr. 347.) The psychotic features were believed to be a result of depression. (Tr. 348.)

On November 20, 2007, Zainer was committed to WCMHC for a period of six-months based on the finding that he was not competent regarding the issues of treatment and medication. (Tr. 342.) On November 26, 2007, Zainer was discharged and conditionally transferred to a less restrictive outpatient setting for the remainder of the six-month commitment. (Tr. 344-45.) His GAF upon discharge was 65. (Tr. 341) James Rutherford, M.D., oversaw Zainer's treatment, with initial prescriptions of Abilify, Seroquel, and Effexor. (*Id.*).

Waukesha County Department of Health and Human Services ("Waukesha HHS") records reflect that Zainer was seen on December 10, 2007, for evaluation by Rita Lofy ("Lofy"), an advanced practice nurse prescriber.[5] (Tr. 354, 482.) She indicated that his current

---

[5] Opinions from non-physician providers, such as nurse prescribers, may not receive controlling weight. See 20 C.F.R. § 404.1513(d); SSR 06–03p. Nevertheless, opinions from these "other sources" are "important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." SSR 06–03p; *see also Barrett v. Barnhart*, 355 F.3d 1065, 1067 (7th Cir. 2004); *Lauer v. Apfel*, 169 F.3d 489, 494 (7th Cir. 1999).

GAF was 50.[6] (Tr. 356, 486.) Zainer was going to continue therapy with Martin Millichap ("Millichap"), M.A. (*Id.*)

On December 21, 2007, Millichap indicated that Zainer's depression with psychotic features was stable (Tr. 357.) Zainer's condition was unchanged on January 21, 2008, and he reported that he had a new job doing data entry. (Tr. 491.)

On February 21, 2008, Zainer's condition was stable. (Tr. 489.) However, Zainer reported that he left the job doing data entry after he was reprimanded for using the Internet for his own private use. (*Id.*)

On March 28, 2008, his condition was "fairly" stable. (Tr. 490.) Zainer reported that he had been accepted at the University of Wisconsin-Milwaukee School of Education. However, he was 30 minutes late for his appointment because he had to turn around en route to go home and take his medications. (*Id.*)

On April 23, 2008, Zainer arrived 15 minutes late for his appointment because a train delayed him. (Tr. 487.) He reported that his symptoms were under good control. He had started a job at Arby's which he said was pretty repetitive work. Zainer also reported that he had changed his mind about school and was going to apply to Waukesha County Technical College to study accounting. (*Id.*)

---

[6] A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders,* 34.

10

On May 23, 2008, Zainer again arrived 15 minutes late for his appointment. (Tr. 488.) He had been fired from Arby's but acknowledged that he was not best suited for a food service job. His symptoms were "relatively stable." (*Id*.)

A seven-page June 19, 2008, disability summary report from Hebron House of Hospitality signed by Amy Queen, SSI case manager, Thomas Wilson, M.D. ("Wilson"),[7] of the Waukesha HHS, and Lofy sets forth Zainer's personal history, psychiatric history, and functional information. (Tr. 464-70.) The report concludes that "[w]ith structured support from his mother and aunt, [Zainer] is able to maintain some sense of normalcy but without this support, his functioning would decline rapidly. Even with medication, therapy and case management, Sam was not able to live on his own in Madison after his mother moved to Mukwonago. . . even with his mother and aunt bringing him food and cleaning his apartment . . . He was forced to move to Mukwonago and move in with his family for support." (Tr. 470.) The report also noted that with rigid family support, Zainer was only able to work part-time for short periods of time before being fired. (*Id*.) The report indicated that Zainer was only able to handle the data entry and general office work job for a few weeks, from January to February 2008, before he was fired for forgetting to wear his identification badge. (Tr. 465.) Zainer reported that he was overwhelmed on the job and it was too fast paced for him. Zainer's job at Arby's lasted from April 22, until May 2, 2008, when his employment was terminated because

---

[7]At times, the Appeals Council decision refers to "Dr. Thomas." (*See* Tr. 6.) However, it has transposed Wilson's given name for his surname.

11

he did not work fast enough.  He also got in trouble for eating a raw french fry in front of a customer.  (*Id*.)

On August 2, 2010, an additional 55 pages of records from the Waukesha HHS, dated February 6, 2009, through July 10, 2010, were filed with the ALJ and designated as exhibit 22.  The ALJ's decision issued August 11, 2010, does not reference them. The Appeals Council's supplemental opinion makes two brief mentions of the exhibit.  It indicates that Zainer's "condition improved with outpatient therapy . . . such that from August 2008 through July 2010, he was able to complete 41 credit hours of college courses in in accounting/business at Milwaukee Area Technical College."  (Tr. 6 (citing Ex. 22.))  It also states that more recent opinion of Dr. "Thomas" dated May 23, 2011, "continues to show improvement in [Zainer's] condition, noting that most of his symptoms are episodic and that he has very good or good ability to function in nearly all work-related activities, but moderate limitations in social functioning."  (Tr. 6 (referring to Tr. 580-85).)

However,  closer examination of exhibit 22 discloses information relevant to the disability determination and favorable to Zainer.  If the Appeals Council considered such evidence, it has not sufficiently articulated its consideration.

A summary of some of the salient points in reports from the first 22 pages of exhibit 22 follows (the remaining data in the exhibit post-dates Zainer's 22nd birthday when he no longer met the Social Security Act's definition of "child").

> •  February 6, 2009 - during an appointment with Millichap, Zainer reported that his frustration with the refusal of the Madison

12

police department to release a copy of their report regarding a complaint of suspected stalking a girl had made against him prompted him to drive to Madison in late January to call the girl because he wanted to apologize to her. Millichap advised Zainer to "let it go" and "seek new friends." (Tr. 524.) At the time, Zainer was taking a "tough schedule" of three or four classes. (Tr. 524-25.)

• March 6, 2009 - Zainer did not keep his appointment with Millichap. (Tr. 526.)

• March 18, 2009 - Zainer reported that he had been voluntarily hospitalized at WCMHC from March 14, to March 16, 2009, for complaints of a low mood, anxiety and paranoia. He sought treatment from Lofy earlier than his scheduled appointment. Zainer had been off school that week but intended to return the following week. (Tr. 527.)

• March 20, 2009 - Millichap noted that Zainer had been voluntarily admitted to WCMHC due to "decompensation (↑ anxiety apprehension, paranoia apparently related to ↓ his meds on his own and becoming overwhelmed by demands of his school schedule)." Millichap suggested that Zainer consider dropping a course. (Tr. 528.)

• March 31, 2009 - Zainer reported feeling much better. He had gone back to school and was deciding whether or not to drop a class. (Tr. 529.)

• April 16, 2009 - Zainer reported he was doing okay. (Tr. 530.)

• April 24, 2009 - Zainer reported he was doing okay, but he was confused about the time of his appointment and originally came in an hour early. (Tr. 531.)

• May 15, 2009 - Zainer reported he was doing well. (Tr. 532.)

13

- June 5, 2009 - Millichap's treatment review sheet states that Zainer was "[h]ospitalized and recommitted after experiencing another psychotic/manic episode when he stopped his meds." Zainer had been referred to "CCS"[8] for "more intensive" treatment, but was not seen as a good candidate for the program. (Tr. 533.) Zainer did not keep his appointment with Millichap that day. (Tr. 534.)

- June 10, 2009 - Zainer was seen at WCHC in crisis. He had stopped taking his medications from May 18, through Mary 27, 2009. Zainer had been released from Dane County Jail the day before after being arrested for stalking a girl he met through Facebook. He traveled to Iowa where the girl attended college then felt snubbed. (Tr. 535.)

- June 12, 2009 - Zainer reported feeling much calmer after being back on Abilify, and stated that he now realized he could not stop or decrease his medications. (Tr. 536.)

- June 17, 2009 - Millichap's notes of Zainer's appointment report problems of depression and indicate that he was again considering referring Zainer to CCS. (Tr. 537.) Zainer had experienced a three-week manic episode and was arrested for stalking a young woman he knew from high school. (*Id.*) Millichap noted that Zainer was "not completely aware /accepting of inappropriateness of his behavior, but agreed not to do it again." (*Id.*)

---

[8] The reference to CCS may refer Comprehensive Community Services, which is authorized under Chapter DHS 36 of the Wisconsin Administrative Code, for persons with mental disorders and substance-use disorders and provides a flexible array of individualized community based psycho-social rehabilitation services authorized by a mental health professional to consumers with mental health or substance use issues across their lifespan.

The intent of the services and supports is:

 * to provide for a maximum reduction of the effects of the individual's mental and substance abuse disorders
 * to restore consumers to the best possible level of functioning
 * To facilitate their recovery

See http://www.dhs.wisconsin.gov/MH_BCMH/ccs/index.htm (last visited January 23, 2013).

14

•       June 23, 2009 - Zainer called Lofy reporting that he felt depressed, lacked energy and motivation. He had been sleeping days and was up at night when his medications wore off. (Tr. 538.)

•       June 26, 2009 - Zainer called to cancel his appointment, stating that something more important had come up. (Tr. 539.)

•       June 29, 2009 - Lofy reported that she called twice to check on Zainer but was unable to reach him by phone. (*Id.*)

•       June 30, 2009 - Zainer informed Lofy that he had missed his June 26, appointment because both he and his mother were upset by mail informing him of an upcoming court appearance on the stalking charge. (Tr. 540.)

•       July 1, 2009 - Millichap noted that Zainer reported some improvement in his symptoms during the previous week after his medications were adjusted. Zainer had "received [illegible] of his court case," but he "appeared rather fragile emotionally." Zainer reported spending time on "non-productive somewhat compulsive activity" writing down numerical coordinates from the state map. He denied any intention of taking off again and said he had always been interested in maps. With Zainer's agreement, Millichap referred him to CCS. (Tr. 541.)

•       July 11, 2009 - Millichap noted that Zainer's mother called prior to Zainer's appointment reporting that Zainer had not come home the night before and had been acting "a bit unusual." She said Zainer had been accepted at University of Wisconsin-Platteville but decided it was too late in the semester to start, that Zainer wanted to move out of his aunt's house, and that he had recently gone to Madison where he tried to get admitted to psychiatric hospital. She also stated that Zainer had increased energy and was feeling discouraged. (Tr. 542.) Millichap's report indicated that Zainer appeared tired and unkempt, but oriented. Zainer said he had left home at 2:00 a.m. to drive to Platteville to pick up his mail from a post office box he had rented when he thought he was moving to attend school. Zainer said he had gone to Madison the week before to sort out a problem at his bank's main office, ran into problems, got upset and tried to get admitted

15

>   to a psychiatric hospital - the emergency room helped with the crisis and sent him home. Zainer was anxious about his upcoming court appearance, mildly paranoid, unable to focus his thoughts, had experienced irregular sleep, and, according to Millichap, was "clearly not doing well." (*Id.*)
>
> •       July 20, 2009 - Zainer did not appear for his appointment with Millichap. (Tr. 544.)

These reports illustrate that as "a person who suffers from a mental illness [Zainer] will have better days and worse days, so a snapshot of any single moment says little about [his] overall condition." *Punzio*, 630 F.3d at 710. Review of the Appeal's Council's decisions does not disclose sufficient articulation of the relevant medical evidence favorable to Zainer's claims.

Moreover, Social Security Ruling 96-7 requires that the ALJ consider not only the objective medical evidence, but also the claimant's daily activity, the duration, frequency, and intensity of pain, any precipitating and aggravating factors, the dosage, effectiveness, and side effects of medication, and functional restrictions. 1996 WL 374186, at *3; *accord Villano v. Astrue,* 556 F.3d 558, 562-63 (7th Cir. 2009). The ALJ also noted that Zainer attended college and earned 54 credits. (Tr. 19.) She also considered his testimony that he continues to take his medications and his condition is still stable. (Tr. 17.)

She noted, but did not explicitly address, Zainer's statement that he has a difficult time keeping up with the pace of even simple work and can become irritable. (*Id*.) The ALJ also did not address Zainer's testimony that his medications – Seroquel, Abilify, and Devolpro (a generic version of Depakote) – make him tired and irritable, (*See* Tr. 42-43), a problem that is also reflected in the medical record. Zainer also testified regarding his daily activities, stating

16

that he tries to do his school work first. (Tr. 43.) He walks about three-quarters of a mile about five times a week, and goes to the gym twice a week. (*Id.*) He attends classes twice a week for about three hours per day. (*Id.*) When questioned about whether he engages in household activities, such as cooking or making something to eat, any type of housecleaning, or social activities, whether he watches television or whether he has friends that he does things with, Zainer uniformly responded "not really." (Tr. 43-44.) He also does not cut the grass, do yard work, or other outside home maintenance. (*Id.*) Although the ALJ noted that Zainer does laundry, drives, and goes to the grocery store (Tr. 18), she did not discuss the negative aspects of Zainer's testimony.

Nor, did the ALJ mention the testimony of Zainer's mother. (Tr. 58-65). His mother testified that Zainer is not able to cook because he has problems with detailed instructions, and needs to be reminded of the next step. (Tr. 59.) Zainer has a very bad time managing money. (Tr. 60.) She also testified that he was more withdrawn lately and showed signs of depression and that it can be a daily thing that goes on for weeks; she can talk him out of it but the next day she might need to repeat the same ideas. (Tr. 61.) She indicated that her son was better on his medication and the delusional thinking had "more cleared up," and that the manic side was a lot better than in May 2009. (Tr. 62.) However, the depression was frequently coming back, as well as a lot of worry and stress. (*Id.*) She also testified that about the difficulties Zainer experienced with his Arby's and data entry jobs. (Tr. 63-64.) Such

17

testimony has relevance to the SSR 96-7 factors and its consideration should have been articulated.

## Residual Functional Capacity

Residual functional capacity is "the maximum degree to which the individual retains the capacity for *sustained performance* of the physical-mental requirements of jobs." 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(c) (2008) (emphasis added). When we assess your mental abilities, we first assess the nature and extent of your mental limitations and restrictions and then determine your residual functional capacity for work activity on a regular and continuing basis. 20 C.F.R. § 404.1545(c)(2012). Although the Appeals Council found that the May 23, 2011, medical opinion was consistent with the ALJ's RFC finding, it did not mention or discuss the opinion that "on average" Zainer would be absent more than three times a month. (*See* Tr. 583.) According, to the vocational expert "anything more than one day a month would rule out all unskilled jobs." (Tr. 70.) Thus, in addition to an inadequate credibility determination, remand is required for reassessment of Zainer's residual functional capacity and his ability to engage in substantial gainful employment within the national economy.

18

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

Zainer's appeal seeking reversal or remand is **GRANTED** to the extent that this matter is remanded pursuant to sentence 4 of § 405(g) for further proceedings that are consistent with this Decision and Order.

The Clerk of Court is **DIRECTED** to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 23rd day of January, 2013.

**BY THE COURT**

_____
**Hon. Rudolph T. Randa**
**U.S. District Judge**